## THE JOHN GRIFFIN.

A vessel condemned for violation of the revenue laws on a clear *primâ facie* case made out against her by the government and not rebutted by the claimants.

APPEAL from the Circuit Court for the Eastern District of New York; the case being thus:

The act of Congress of March 2d, 1799, "to regulate the collection of duties on imposts and tonnage,"* enacts by its 50th section, " that no merchandise shall be unladen from vessels coming from any foreign port but in open day; that any person who shall be concerned in thus unlading them, shall forfeit and pay severally, for each offence, $400, and be disabled from holding any office of trust or profit under the United States for a term not exceeding seven years, and that when the value of the goods unladed exceed $400, the vessel, tackle, apparel, and furniture shall be subject to seizure and condemnation."

The same statute, after directing how seizures for violations of it shall be made, enacts:

"SECTION 71. That in actions, suits, or informations to be brought where any seizure shall be made pursuant to this act, if the property be claimed by any person, in every such case the *onus probandi* shall be upon the claimant."

With this statute in force, the United States libelled in the District Court at New York the bark John Griffin, owned by one W. Downey and three other persons, on an allegation that her officers had aided in introducing segars of the value of more than $400 into New York City, from Cuba, A.D. 1868, in violation of the law.

There did not seem to be any reason to doubt that the segars were brought into the city by night from Cuba without paying duty, and that this was done with intent to defraud the government. And the only question in the case was

* 1 Stat. at Large, 665.

whether Downey, the master and part owner of the vessel, had participated in this fraud by bringing the segars on his vessel.

The segars were seized in a room where they were stored in New York, and the owner of the segars, one Albren, was the principal witness for the government. His testimony amounted to this: that being in Havana, and desiring to get a large lot of segars through to New York without payment of duty, he met in that city Captain Downey, whose vessel, the John Griffin, was then lying at Matanzas taking in or waiting for cargo; that he suggested the matter to Downey, who neither accepted nor declined, but that a few days afterwards he received a letter from a carman at Matanzas saying if he would send the segars down, the carman would see them all right, which was done; that in a very few days after this he received in Havana a letter in these words,—the letter itself, which had been found by the custom-house officers in Albren's writing-desk before they made the seizure of the segars, being produced by them in evidence,—

MATANZAS, September 23d, 1868.

MR. JOHN ALBREN.

DEAR SIR: Your twenty-two boxes, trunk, and barrel package are all on board safe. I wish your boxes were all hid'en, the same as my sugar boxes. They are too easily distinguished, but I think they will be all right.

Yours, respectfully,

W. DOWNEY.

Albren further testified that shortly after the vessel arrived in New York the segars were delivered at a place designated or agreed on between him and Downey, and that he paid Downey over $3000 for his services in the matter. He mentioned the place where he met and paid Downey, and stated that a man named Morlina was present when this payment was made.

Morlina's testimony corroborated that of Albren as to the receipt of the money by Downey. He testified that he went with Albren and was present when Downey, whom he knew,

and Albren met on the street and retired to an office in South Street; that he saw Albren hand Captain Downey a bundle of money, but did not know how much; that it was a bundle of paper money.

To rebut this apparently good case against the vessel, Downey himself came forward. Efforts were also made to impeach the veracity of Albren.

Downey swore positively that the segars were never on board his vessel with his knowledge or consent, and to his *belief* that they were not there at all. He admitted an interview with Albren in Havana, or somewhere else, in regard to a trunk and barrel package. He equivocated about the authorship of the letter produced by Albren, saying that he "could not say that it was written by him," "that it might have been written by him," "that it looked like his hand-writing." He nowhere denied that he wrote it. He attempted to explain it by saying that it might possibly have referred to his having seen these things on board *another* vessel, not his, as a service to Albren, to let him know they were there, but with no knowledge that they were to be landed without paying duty. But he did not speak of this with certainty, nor did he give the name of the other vessel on which he might have seen the segars. The receipt of the money from Albren he wholly denied.

As to Albren's character for truth and veracity, four witnesses swore that his reputation was bad; but against two of these, proceedings had been begun for frauds on the revenue, and Albren was to be a witness in them. Several other persons testified that they had known and dealt with him, and that, so far as they knew, his character for truth and veracity was good.

A more striking evidence, perhaps, against him on this point, consisted in the fact that after these segars had been seized by the custom-house officers, and proceedings of condemnation had been begun against the vessel, Albren went with Downey to the office of one McGowan, proctor of the claimants, to make an affidavit to subserve their case. Being questioned by the proctor as to whether he had shipped or

received any goods by the John Griffin, he said that he had not. The statement was then reduced to writing by McGowan thus, it not, however, having been sworn to nor signed by Albren: ·

"Deponent further says that he did not receive from on board the said bark John Griffin, at any time during the year 1868, any segars whatever; and that no segars whatever came consigned to deponent in said vessel at any time during the year 1868."

McGowan's draft of the intended affidavit being produced on the hearing of the present suit, and he having testified to its being what was said, Albren was called on to explain it. And this was the explanation:

"When I visited McGowan's office, I went first time with the captain. He questioned me whether I shipped or received any goods by the John Griffin. I told. him not. He continued writing, and. after he got through he read it to me—the statement which he wanted me to sign—and I refused to sign. Then he told me that he would give me $500 himself; not the captain, but himself, after the trial was over. I told him these $500, I should like to have them before the trial, and for my evidence of not having shipped or received any goods by the bark John Griffin only."

The District Court rendered a decree of condemnation, which was reversed in the Circuit Court; and the United States, dissatisfied with this latter decree, appealed to this court.

*Mr. Donohue, for the appellant,* argued that this attempt to confiscate a valuable vessel rested wholly on the testimony of a convicted smuggler, a man so base that he now unblushingly avows that for $500 he was, a short time since, ready to swear to what he declares was a gross lie. Such testimony, the learned counsel contended, was not fit to be received in any court.

*Mr. C. H. Hill, Assistant Attorney-General, ·contra,* contended that the evidence offered in behalf of the govern-

ment presented a *primâ facie* case, which the testimony of the claimants had failed to overcome; and that in such a case sentence of condemnation necessarily followed.

Mr. Justice MILLER delivered the opinion of the court.

Upon the case as made out by the government, in the absence of any rebutting evidence, no court or jury, we think, could hesitate in finding that Downey had been guilty of aiding in the fraudulent introduction of the cigars without payment of duty. The case as thus made amounts to something more than the probable cause, which, by section seventy-one of the act of 1799, throws the *onus probandi* on the claimant of the vessel. It is a clear *primâ facie* case, and both by the statutes and the ordinary rules of evidence required of the claimant such testimony as should satisfactorily rebut the presumption of guilt which it raised.

The principal reliance of the claimants for this is upon the testimony of Downey, who attempts to explain his letter, and upon an effort to impeach the character of Albren for veracity. But the whole of his explanation and account of the letter and its purpose is vague, unreasonable, and altogether unsupported by any other testimony, or by reference to anything which would confirm it. While every word and line of the letter is in exact harmony with Albren's account of the transaction, and must be regarded as decisive as to the relative credibility of the two stories told by the witnesses.

In reference to the receipt of the money also, while Downey flatly denies it, and thus is in direct conflict with Albren, the latter is supported by Morlina, who tells a consistent story, and whose veracity is unimpeached.

It is not unimportant in this connection to consider also that Downey swears under the influence of being owner to the extent of one-fourth of the vessel, and that the charge against which he testifies is an implication of bad faith in him towards the other joint owners, and a fraud and a crime against the government, for which, if guilty, he is liable to severe punishment.

The attempt to impeach Albren's character rests on the testimony of four witnesses. Two of these were parties to judicial proceedings alleging against them similar acts of fraud on the revenue, and Albren had been, or was expected to be, a witness against them. On the other hand, several witnesses are called who testify to his general good character for truth and veracity. In this respect we do not think he has been successfully impeached.

As to the statement introduced in evidence, as taken down in the office of the claimants' attorney, purporting to be made by Albren, though not signed or sworn to, it seems to us that his own account of it is probably correct, namely, that it was an attempt to commit him before the trial to a statement which would exonerate Captain Downey, and that the offered bribe failed, probably because neither party would trust the other by signing the paper or paying down the money first.

We think that a case is made out against the vessel, and that the decree of the Circuit Court must be REVERSED, and a judgment rendered in favor of the United States in that court.

DECREE ACCORDINGLY.